The last case today, number 241759, Triumph Foods, LLC et al. versus Andrea Joy Campbell et al. Will counsel for the appellants please come up and introduce yourself on the record to begin? Thank you. Good morning, your honors. Michael Ralph on behalf of the appellants. I'd like to reserve two minutes for rebuttal, please. Okay, you may. And before you begin, let me just note that in this case we have five amicus briefs that have been filed. So I just want to thank the amicus that filed these. And they're very useful regardless of who they're supporting. So please begin. And actually, I'll pose a question before your eight-minute start. Tell us why Ross in the Supreme Court case is applicable or inapplicable to this situation. Thank you, your honor. And may it please the court. We'll start there. We'll start with Ross. And I think the key distinction in Ross is that none of the claims in Ross asserted discrimination under the Dormant Commerce Clause. In fact, Justice Gorsuch makes clear in his opinion that not only were discrimination claims not raised in that case, but when asked at argument, counsel specifically said, we aren't asserting any discrimination-based claims here. That's entirely distinguishable from what's occurring in this case, where Triumph and the farmer plaintiffs as well have always asserted from the complaint through all of the proceedings the discriminatory effect that the act has upon interstate commerce. And I think the clearest way to look at that discrimination piece of it is this court's decision in Jenkins. There, it was the gallonage cap to determine what wineries are large or small wineries, and therefore dictating what types of distribution methods could be used. And what this court held in Jenkins is that the state set that cap in such a manner that it impacted only out-of-state wineries, and it didn't impact any of the in-state wineries. And that's precisely the situation we have here. Massachusetts made the determination to define as cruel well-accepted farming practices that are used only on out-of-state farms. It's the exact same situation that you had in Jenkins. And so from the Dormant Commerce Clause perspective, with respect to the farmer's claims, all this court needs to do is apply Jenkins. But counsel, there's Supreme Court precedent that says that if all a law is doing is shifting market share from one state, from one set of producers to another, out-of-state producers to another set of out-of-state producers, that's just not discriminatory. So you're right that there was no discrimination claim in Ross, but given the other Supreme Court precedent that says shifting market share from one category to another is just not discrimination, how do you have a viable record? The record demonstrates that none of the in-state farms use the practices that were outlawed by this act. But the Supreme Court precedent that I'm talking about doesn't suggest that that makes a difference. It says very clearly that if the impact of a law, it applies to everybody, whether they're in-state or out-of-state, and what it'll do is shift, like I said, market share from one state, one set of out-of-state producers to another, but that's just not enough under the dormant commerce clause. And maybe, I apologize, maybe we're speaking, so it impacts the process of production as well, and I think that that, so if you look like, for example, at the Hunt versus Washington Apple Marketing Association case from the Supreme Court, and that was the labeling of apples in North Carolina versus Washington, and what the court described there was that the state of North Carolina, none of the apple producers had to their practices in any respect whatsoever, whereas the Washington producers would have to change the production, the production process, how they packaged, how they marketed, all of the rest. And that's the same situation that you have here, because the burden falls. But it's not the same situation because there's some out-of-state producers who won't have to change their processes. In other words, there's a whole set of farmers who are already also following the practices that Massachusetts has legislated. So that seems to be a critical factual difference. I don't believe so, Your Honor, because the same would be true here. You have farms both in-state and out-of-state. So I apologize, maybe I'm not seeing the distinction. The changes that have to be made have to be made at farms that use these type of practices, and the record demonstrates that none in the state of Massachusetts do. So I don't see how that's distinguishable from Jenkins, for example, where this court held that the state's selection of that criteria in the act is what caused the discrimination. I'd also like to, if I could, the other point would be on the preemption piece, the Harris decision and the express preemption clause in the FMIA. In some of the broadest preemption language possible, Congress chose not only to forbid different requirements, but any additional requirements that are imposed as well. And as the Supreme Court's unanimous decision in makes clear, the act's sales ban in this case does exactly that. Allowing this type of regulation through a sales ban, the court described as making a mockery out of the FMIA's preemption provision. And what the court focused on that's critical here in Harris is whether the statute functions as a command to the processing facilities to implement some sort of a procedure. And here, what the record demonstrates is that all throughout the production line. So you're saying that the demand is that the processing facilities buy pigs raised a certain way? Did the command? Well, there's several. I mean, because once the pigs are given to the processing facility, then they're not killed any differently or processed any differently. It's just the way they're raised before they get to slaughter. That's the difference. No, that's not correct, Your Honor, because what this what this requires and mass and the Commonwealth tells you this on page 66 of their brief that we have to be able to identify where all of these pigs came from throughout the entire production process. So let me give you some examples. So when when the pigs arrive at a processing facility, the FMIA regulates right now the inspection process that occurs, what pigs have to be segregated, how they have to be sorted, how they have to be processed through that initial phase. This adds an additional requirement to that because now not only do they have to be segregated based on those FMIA characteristics, they also have to be segregated based not on how they were housed, but upon how the mother pigs were housed at at the farm. So it's adding layers. And again, that can that does not conclude at that initial inspection phase, because what this what the Commonwealth is requiring is that every pork chop that's shipped out of this facility, you have to be able to track back to one of those specific pigs and how that pig was raised on a farm. And what Harris describes, and this is at page 466 of that opinion, is that when you're imposing different requirements, different requirements upon what characteristics you can, what animals you can turn into meat, that violates the express preemption provision of the FMIA. So again, and Justice Kagan's unanimous opinion for the court. So you're saying you're saying that ordinarily aside, I mean were it not for this mass statute that any pig coming into into that into a slaughter facility would be treated the same regardless? There would be no paperwork tracking requirements? I'm not, I don't follow what you mean. There there certainly there are requirements that are required by the FMIA. Yes, and that's exactly the point, is that when you add additional or different requirements to that, that's the paperwork requirement? Absolutely not, Your Honor, because again, it's sorting the pigs when they come in. It's then stopping the production line so that a different segment of pigs can then be processed. It's then stopping and sorting. They have to be sorted then throughout the production process, stored differently, shipped differently, using different SKUs because they have to be again, tracked back to the same. It's all throughout the production line. It changes the actual process of how the facility operates. And at the very least, that's certainly the only evidence that was in the record. And recall that we're here on a motion for summary judgment. So the only record, the only record evidence that was there established all of those significant changes to the process. And that's why the preemption, the preemption clause applies. Again, following Justice Kagan's unanimous opinion in Harris. Okay, thank you. Thank you, counsel. Well, attorney for Appelese, please come up and introduce yourself on the record to begin. Good morning. Mary Ann Reynolds for the Commonwealth Defendant State Officials. The district court made no reversible error substantively or procedurally. And with our thanks also to the amici who put this all in perspective, including the authors of the underlying ballot initiative. And with the court's indulgence, I will focus my time on disposition of the multilayered commerce clause claim. And then time permitting, adjust the other claims resting on our brief if time elapses. There haven't been any questions about the Rule 56 procedure yet. And I did want to begin with that because that is a primary feature of the brief that we are opposing. Cutting to the chase on that, the Rule 56 procedural issue, we do not concede that there was any error under Rule 56 and rely on the record in our brief for all of the reasonings. But for argument's sake, even if this court were to find that there was a notice issue, it was harmless error and justice would not require a remand. Because unless plaintiffs have shown prejudice, it's harmless error and they have not shown any prejudice. And the cases cited in our brief that I would draw to your attention are the Block Island, Wells Real Estate, and Chung, each of which argued a lack of notice. But crucially, and different from this case, each of which had a showing of prejudice. Aside from the procedural issue, why don't you start with Ross and tell us why you think their Ross distinction is not a distinction that makes a difference? Yes, thank you. Because the the allegations in Ross were materially indistinguishable allegations from the ones brought here. What's happening is that these plaintiffs... Did it have a discrimination? They're saying it didn't have a discrimination claim and that that's the key difference. Yes, but what we would say is that discrimination is a theory, right? It's a legal theory. If you actually begin with the factual allegations, they're not materially different. Just what happened is that in Ross, there was a full-out industry press against Proposition 12. They, it is true, they did not bring a discrimination theory under their Commerce Clause Challenge. And there is a discrimination theory here. So unless you can find discrimination, the holding in Ross applies here. So again, we are saying that there's no material allegations of fact that differ and that Ross's decision that the Proposition 12 rule challenge, law challenge there, that the complaint against it failed to state a claim, that that's a ruling of law that needs to be applied here and that the District Court properly ruled that it was going to not engage in a pike balancing test because Ross decision foreclosed it. But counsel, as you said, that really requires first concluding that there is no discrimination before we can say that Ross is dispositive, right? Agreed. Just one of the things I was trying to figure out, and it'd be helpful to have your analysis of it, is even though there's many different opinions in the Ross case, really what the court sort of says there is the purpose of the pike balancing test is to smoke out discriminatory purpose or effect when it's not sort of obvious from the face of the statute or obvious in other ways. And so in some senses, one could say that was a simple case because the plaintiffs and Ross conceded there's no discriminatory effect. And so the Supreme Court then says, well, if Pike's about smoking out discrimination, that might be hard to see given there's a concession of no discrimination. There's just really almost no cases where they've ever found violation under pike balancing where there wasn't actually a discriminatory effect. So I'm just trying to figure out here, do you agree that if we were to find discrimination, then obviously the pike balancing would be entirely different? Or I guess we could stop at the discrimination finding in and of itself. So I'd like to be able to argue that the court, I'd like to answer your question, but first preface that to say that I'd like to be able to argue that the district court properly determined that there is no discrimination here with the act, with that particular provision severed on the slaughterhouse sales exception. If the court were to disagree and feel that there might be discrimination, then What's the Commonwealth's position? Is there discrimination? If there isn't, why not? There absolutely is not discrimination. The district court was correct in that. So the district court properly rejected the challenge to the act on discrimination theory, which was brought by the farmers. One part of it was brought by the farmers, one part of it was brought by Triumph, the slaughterhouse. If I could just really quickly just take care of the slaughterhouse piece. The district court did find that there was no discriminatory purpose in the passage of the act, but that there was a minor discriminatory effect relative to slaughterhouses, and he applied the appropriate remedy, which was to sever that provision, and we do not object. So that provision is out, the remainder of the act stays. The remainder of the act has no discrimination in it, in effect or purpose. That was decided properly by the district court on a summary judgment record. The district court accepted all of plaintiff's material factual allegations that were notably their cost contentions, and that they raised pegs in states where the sector, that sector of the economy is much greater than it is here, and it just does not raise to the level of a unconstitutional discriminatory action. Triumph says that this case is Jenkins, so how do you respond? Why is this not Jenkins in the Commonwealth's view? This is not Jenkins. One, obviously there's no licensing scheme involved here with the act, but missing is substantial evidence that the act in purpose or effect gives an economic advantage to Massachusetts farmers. Conjecture cannot take the place of proof. That's established in Jenkins and Cherry Hill. The act is even-handed, and it does not significantly alter the terms of competition between in-state and out-of-state sellers of pork. And so there's just, there's, the discrimination theory fails on that. It's because it's even-handed. And there's just no... In-state pig farmers can always sell under the Massachusetts scheme, but that's not true for out-of-state manufacturers who don't. So you're saying that in-state farmers aren't advantaged, but they are because under the scheme, they always have the ability to sell in Massachusetts. No, Your Honor, because of section 1-3 of the act. So the act does two things. Only one, so the two things that it does is it tells Massachusetts farmers that they cannot use gestation crates for hogs. A number of other states do the same, but it tells all Massachusetts farmers you can't use gestation crates. Then the second thing that it does is it has a sales ban on pork products. So Massachusetts farmers, just like any producer of pork, any seller of pork coming to Massachusetts, has the same conditions of sale under the act. That being that you can sell your pork products, but they need to comply with the housing standards established. And so Massachusetts farmers can sell presumably anything, hopefully anything that they have to sell is going to be compliant because they are not using gestation crates. Out-of-state producers, they can also sell as long as they can show that the breeding pig was not confined in a cruel manner. And as it is the same, the sales provision acts even handedly. Everybody can sell in Massachusetts. In fact, Massachusetts welcomes sales of compliant pork wherever, whatever state the products originated from. And as Amiki presents, significant portions of the hog industry from across the country have responded positively. You know, there's differences in local views on what constitutes animal cruelty, but local views can differ and this court doesn't need to pick sides on that. Counsel, so your argument is actually that the law is more burdensome or more restrictive on in-state farmers because they can't use gestation crates at all. So regardless of where they may want to sell their products, they always can't use them. Whereas out-of-state producers can have some of their pork made through compliant practices and some not compliant. It's just that they can only sell to Massachusetts the pork that was made with the compliant practices. Yes, Your Honor, exactly. But then just returning for a minute to Jenkins, because that seems to be a very central focus of Triumph's arguments, you're saying that the key difference is that there's no showing of economic advantage to in-state farmers and that Jenkins required a showing of economic advantage. Is that your argument? That it requires probative evidence of discrimination. Yes, and that there is no probative evidence of any discrimination. Counsel, let me ask you, what if the law here were different and it would, for maybe a similar reason, but conclude that or the law would say that no pork can be sold in Massachusetts because the voters have concluded that there's no way to grow pigs in a way that it's, you know, in a humane manner. Would that be the same? Would it stand scrutiny if it was a total ban on any type of pork? Hypothetically, yes. I mean, there are jurisdictions that ban horse meat, as cited in the record. And those, you know, that ban on horse meat was referenced by the Supreme Court in the Harris decision without any particular concern. I mean, they didn't particularly reach the issue, pinpointed down. But there's no reason in any Supreme Court decision to suggest that Massachusetts could not, if it chose to, outright ban the sale of pork. And let me give you another hypothetical. Let's assume in Massachusetts, it's the biggest manufacturers of contraceptive pills or whatever. And let's assume a state number X bans all that. That would still withstand the analysis under Commerce Clause? I mean, there was a parade of horribles that was before the Supreme Court in the Ross decision, you know, what, along this line.  Along that line. Yeah, there were a number of examples. And even with those questions presented to the Supreme Court and considered, the Supreme Court still said that this particular type of act does not, this particular act, meaning the Massachusetts Act, which is materially the same as a California Act, does not raise a Commerce Clause. It does not violate the Commerce Clause. And there, the case was dismissed on, was dismissed. You know, here we actually, they had the opportunity for a summary judgment record. So I would like to not go down and answer like each parade of horribles, because I do feel that that has already been vetted through the Supreme Court in the Ross case. Let me also ask you, for example, Triumph, there's no prohibition that, for example, if it can't sell this pork in Massachusetts, but it could target New Hampshire, it could target Rhode Island. And, you know, anybody from Massachusetts who wants to purchase that has to go out of state. But there's other ways to market it, correct? Yes. Thank you. Thank you. Any further questions? Rebuttal, two minutes. Thank you, Counsel. Please reintroduce yourself on the record. You have a two-minute rebuttal. Michael Raup on behalf of Appellants. Three quick points on rebuttal. First, Judge Helpe, to your point that you just made about the parade of horribles, I think that is really important here. And the critical distinction in why Ross doesn't answer it is because Ross was not a discrimination case. And what you're getting at is exactly the point. The point we used in our briefs was lobstermen in Massachusetts. You can use any sort of example about an industry that's important to a specific state. And when there's evidence in the record, at summary judgment, that that discriminatory effect is what is playing out, that's what requires the reversal here. What's the evidence in the record that the discriminatory effect is playing out? The discriminatory effect is playing out because it changes the required processes for out-of-state entities only. So going back to what was required in Hunt or what was required in Jenkins, the evidence that was required in Jenkins was not the economic impact of it. The evidence that was required was how it disrupted the economic market and the production market. And that's what we have here. But isn't the difference, again, that it's only disrupting the processes for some out-of-state farmers and not others? No, because it's still discriminatory. And you can look at, there's evidence in the record about the scope of it too. And this also plays on your other point that you made, Your Honor, and I have to disagree with my friend that if Ross isn't dispositive, I'm sorry, Ross is not dispositive even if you find no discrimination. Because as you mentioned there, there are fractured opinions, right? But what we glean from those, and this is briefed in the briefing, is that the First Circuit requires that we count votes to look at what the commonality of the decision is. And what came out of that, there's six votes that retain Ross, and there's five votes that say that if Ross remains good law- You mean Pike. Pike, I'm sorry. Pike, yes, I'm sorry. That Pike remains good law, and five votes that say that if Pike remains good law, that complaint there would have stated a claim under Pike. And so my point is that if you get to the point where you find that there's no discrimination- How do you get to five votes? There are five votes saying that the complaint didn't state a claim. No, it's Justice Barrett joins with the four primary dissenting votes authored by Chief Justice Roberts. Justice Barrett says, I don't think that we should engage in this Pike analysis at all, but if we did, this complaint would state a claim. So she would be the fifth vote to get to stating a claim on the Pike analysis. And we've dissected, I think, those in our briefing as well and outlined those various positions. If I may make two quick points. 30 seconds. Thank you. Second, at the very least, this is a situation that requires a remand, both with the Rule 56F procedure where there was no notice given. It's not harmless error. If you look at the joint pretrial report, 805 to 884 in the appendix, it shows all of the disputed fact. And then third, and finally, on the preemption piece, there's no answer to Harris. If you look at the district court's decision, line it up against Harris. They cannot be reconciled. And remember here, we're dealing with one state law. All those things we talked about, Judge Thompson, about the differences that have to happen along the production line, and we're talking about one state. What happens when California and New York and whoever other state decides that they have a different view on how pork production should occur? That's why it's a federal issue. That's why preemption controls.